The first case is Wyeth v. AstraZeneca, 2024-2325. Ms. Sweezy. Good morning, may it please the Court. The District Court's fatal dose theory for granting J-Mol had no evidentiary support, none, and AstraZeneca does not even defend that on appeal. What AstraZeneca calls the District Court's holding is irrelevant semantics, but it is neither. It is not irrelevant. It was the basis of the District Court's judgment, and it is not semantics because there is a complete absence of proof. Counsel, you may have a point regarding unit dose. And we're not the FDA, but this patent has doses, and that's essentially a constructive reduction to practice. There are no examples of actual doses and treatment for these compounds, particularly the accused compound, which I don't think is there. But evidence shows, and the Court relied in part on that, that at the stated doses, that is five times the toxic dose. So why isn't that a failure of enablement? Your Honor, toxicity is not part of the claims, and that is clear in the District Court's claim construction, which is not being challenged by AstraZeneca. But the claim reads treatment to patients, and that presumes enablement requires that it be effective. Your Honor, as you noted, there's no actual reduction to practice requirement. And in fact, you can't start to even treat patients until you're into FDA territory. And this Court is very clear that being ready for patenting. If you have a method for treating patients, it has to be enabled to treat patients, though. It can't just be a composition claim to the underlying drug, right? That's absolutely right, Your Honor. You have to enable a unit dosage that treats patients. Yes, and look. I think you agree, there's no embodiment in the specification that is enabled or has written description to treat a patient. There is, Your Honor, because we have disclosure. Let me start by saying that the- Let me be clear. I understand you have disclosed specific inhibitors. There's three examples, I think. Maybe you can correct me if I'm wrong. Those don't specifically- there's no evidence of the unit dosage that you would use those to treat patients, right? You just disclosed inhibitors. No, Your Honor. Where does it disclose what the dosage is for those inhibitors to treat a patient? I thought we had the inhibitors. We have some in vitro studies. And we have some general testimony that people would just know how to do this. What you also have on the face of the patent, and this is at column 2, line 65, to column 3, line 7, it notes that- we have to keep in mind, this is coming after a similar compound, reversible inhibitors called gefitinib and erlotinib. Those are, as the patent says, conventional cancer treatment. And that dosage range is exactly what our patent in the specification and in claim 1 and 162 recites, up to 500 milligrams. There's nothing novel about the dosage range. It was used for irreversible inhibitors. And these are conventional doses in this field. There was testimony that the jury could certainly credit that treatments of these compounds for similar cancers, breast cancer, lung cancer, were all in this range. And there's prior- It took me a while to get to that. Column 2, this is page 204 of the appendix. This is page 204 of the appendix, Your Honor. So from the bottom of column 2, starting at 65, it's talking about gefitinib. And then at the top of column 3, erlotinib. And it says, if you continue in that paragraph, when conventional cancer treatment is done with both Aressa and Tarceva, which are the trade names for those compounds, involves the daily oral administration of no more than 500 milligrams. That maps on exactly to what our patent says, and specifically states at column 8 that you would be giving a dosage range up to 1,000, or preferably 500. Two things on column 2, though. These aren't the inhibitors that they're examples that you gave in your patent. These are different kinds of inhibitors for different kinds of patents, right? Or different kinds of cancers. No, they're not for different kinds of cancers, Your Honor. They're for non-small cell lung cancer. They are exactly the same cancer. And they are essentially- So can you tell me- I'm sorry, I have a hard time reading some of this. Where does it say, this inhibitor used in this dosage will treat small cell lung cancer in a patient? That is disclosed at column 8, where we say these are the dosage ranges that you could use 2 to 500. And the patent recites- That's not good enough. That's the problem, is 2 to 500 indisputably includes ranges that are ineffective and that are toxic. And so you have to disclose something that actually- I understand the clinicals. I agree with Judge Lurie. We're not the FDA. We don't have to wait till clinical trials and stuff for you to patent it. But if you're trying to patent a method of treating a patient, you have to at least give us an example or two of the specific doses to treat a patient, don't you? Your Honor, no. Because there are animal studies of the specific examples that are decided in the patent. And we have testimony from the other side that the differences among cancers, so these same inhibitors, HKI272, EKB569, HKI357, all of those inhibitors were being given to patients in similar cancer settings in breast cancer or even in lung cancer across solid tumor cancers just like here. There is nothing novel about this dosage range at all. We said that in the prosecution history, which, of course, the jury could credit. I'm not arguing the dosage range. But I think you, in order to show somebody how to do it, you have to show them examples of which at least a couple dosages in the range that work, don't you? What our patent shows, and if you look at figure 4B, and this is at the specific page, figure 4B is on- Is there anything- I know you want to tie together a bunch of statements and say, well, this will teach you a specific dosage to treat a patient with this class of inhibitors. But is there any kind of specific example that says, use this dosage, not a range, this dosage of this inhibitor to treat a patient? We are, of course, entitled to claim ranges. And there's nothing from AstraZeneca, who carries both the burden of clear and convincing evidence, and J-MAL to suggest that anything in this range doesn't work. And in fact, all of the evidence is to the contrary. And their own witnesses agreed that using these- But if you claim a range, if it requires undue experimentation to come up with actual dosages that will fall within that range, isn't that an enablement problem or a written description problem? But that's nothing that AstraZeneca even attempted to show. And let me trace it back to the toxicity concern, Your Honor. I mean, enablement's a question of law. I mean, that's before us. Of course, but based on multiple underlying facts. And what AstraZeneca does on appeal and did at the district court was run a toxicity side effects argument, which does not work. That is not a viable- You said there's nothing novel about dosage. Then what's the patent about? It's a method of treatment, Your Honor. I know. Exactly. And so it is- It involves dosages. It's using well-known compounds, irreversible EGFR inhibitors, already in the art, already used in similar cancer settings. Well-known compounds. What justifies the patent? The idea that- so Gifitinib and Erlotinib were not working. Those were not working. And there was a real need to figure out these patients who had initially responded, so they're sensitive to Gifitinib or Erlotinib and are no longer responding. So how can we fix that? Our inventors came up with a very novel, patentable invention that this irreversible EGFR inhibitor that has a difference in how it covalently binds to a very specific region in EGFR can treat those patients who should, you would think, be responsive to Gifitinib or Erlotinib or not. It is a method of treatment using well-known compounds already being used in lung cancer, in breast cancer. And their experts- The claim does call for a unit dose applied to a patient on a daily basis. So the claim is specific to the unit dose. And just to follow up on Judge Hughes' question, where in the patent is there any guidance as to how one of skill and the art would make that determination? What the jury heard- I assume that all of the hundreds or thousands of different structures that meet the functional limitation would operate in a slightly- Each one operate in a slightly different way in terms of effectiveness. So how would one determine for any specific compound what the unit dosage on a daily basis should be? Your Honor, if you look at figure 4B, you will see the potency and effectiveness of our irreversible inhibitors in this method at very, very low amounts. And the experts- Our expert testified that this information, our witnesses testified, translates- It predicts activity in humans. That predictability from the cell line data that is in the patent translates because it was already translating in similar cancer settings. And their expert, Dr. Yanni, admitted that the prior art that's cited in the patents on animal studies and on humans discloses irreversible inhibitors administered to patients in daily units of two to 500 milligrams, exactly what our patent says. The fine-tuning of exactly what range- That's what doctors do. That's standard in the art. That's what our expert, Dr. Househair, testified to. Dr. Taft, another AstraZeneca expert, admitted that irreversible dosage range for other cancers is relevant, and the vast majority of drugs are dosed between one and 1,000. This is not the novel part of our invention. It may sound simplistic, but the beauty of this was identifying these compounds already known in the art, being able to overcome this strange resistance that patients who were otherwise responding to reversible inhibitors were developing. It sounds like you're claiming an idea. The compounds are old. The dosage is not significant, as you say. It sounds like a research paper. No, Your Honor, it's a novel method of treatment of using preexisting compounds in a new way that had not been previously- I'm sorry, Your Honor. Preexisting compounds. Yes, Your Honor, but been used in a novel and new way. And the toxicity issue, I just want to underscore, all of that should be irrelevant. We don't need to deal with finding levels of dosages of toxicity because the District Court at Appendix 56 to 57- But why did you add in unit dosage to the claim? That's specifically where he ruled multiple times that AstraZeneca, if you look at the 28, page 28 of their red brief, they are not challenging that toxicity is not required. All of these things, these considerations are out. Effective amount, pharmacological effectiveness. I know, but that's not really what I asked. Sorry, I wasn't very clear. If the whole point of this patent is there's these preexisting inhibitors out there that you came up with a new way of using them, then why didn't you just claim that method of using them? Why did you add the unit dosage in a patient language? That was added during prosecution, wasn't it? It was, Your Honor, and it was not in any way to suggest that that was novelty. In fact, if you look at the prosecution history- Well, why was it added? It was added because the examiner was mistaken in using a reference as anticipatory that had extremely high dosing, unconventional dosing. That's within the prosecution history. Well into your rebuttal time, you can continue or save it. I'll save it, Your Honor. Thank you. All right. Mr. Sipes. Good morning, Your Honor. As you know, I'm Christopher Sipes here on behalf of AstraZeneca. I want to pick up that point first, if I may, which is why unit dose was added and whether dosing was a point of novelty. And the answer is easy because in the file history, it shows the requirement of a daily unit dose was added to distinguish priority that taught treating resistant cancer with what the applicants here disparaged as overdosing and specifically with dosing that was not well tolerated. For example, in their August 2019- Every treatment is medical treatment is in a unit dose. It's either a pill or a capsule or an injection. In fact- That's almost useless language. Well, the unit dose here is defined to include a predetermined amount calculated to produce the desired therapeutic effect. Isn't that true for every type of medicine? Only after the hard work of determining what is the dose calculated to produce the desired therapeutic effect. That's FDA work, right? In this case, that what was- Patent discloses a range of doses. And in fact, during the prosecution to distinguish the art, they said some of those doses are too high. At appendix 37114, as part of the February 2018 response, Wyeth relied on the daily unit dose requirement to distinguish age aegises. That was the prior art description of amounts up to 500 milligrams per day, 500 milligrams per day or more, as 6.7 times higher than what would be a unit dose for the particular inhibitor they identified in 2018 hours. And said that that was too high. In other words, you're saying that the constructive reduction to practice failed. Because of data that were later generated. What I'm saying more than that is that, first of all, there was no working example and there was no identification, no reduction to practice of daily unit dose for any particular embodiment, not even a teaching of how to do it. So if you think about- What about the argument that, you know, they identified some of the inhibitors, that they were well-known, and there were animal studies and in vitro studies that showed this worked, and that the range that was given was the typical dosing for cancer treatment. Why isn't that enough to show a skilled artisan how to come up with the unit dose? There's at least three problems with that. First of all, let me be clear. Dosing for gefitinib or erlotinib-resistant non-small cell lung cancer, which is the disorder here, the disease here, was not well-known. That was part of the point, is that people were trying to figure out how to treat it. So people didn't know how to dose it. There was no, quote, conventional dosing. And second, irreversible EGFR inhibitors at the time were described as investigational. There was no established dosing for irreversible EGFR inhibitors at that time in 2005. They, too, were investigational. So the research projects here, that none of which are answered in the patent, none of which, there's even examples in the patent of how to do it, is one, to find an irreversible EGFR inhibitor that has a unit dose, right? So first you have to find the inhibitor. Then you have to determine whether that irreversible inhibitor binds to the designated cysteine, which their own experts said requires testing to see that it's binding covalently to that cysteine. Then you have to determine what is the dose based on things like bioavailability that will both, if it's possible, inhibit the cancer cell, and at the same time not be so toxic it cannot be administered on a daily basis. And they said those were important things in the file history. They said you can't just overdose, right? You can't use overdosing. There is no identification of any examples of conventional dosing for irreversible EGFR inhibitors. And it has to be determined on a compound basis. I would point to, by the way, that it is not the case that they're just claiming the irreversible inhibitors of the past. There are, for example, and this is what ultimately worked, mutant-selective wild-type sparing irreversible inhibitors. That's among other things. What's this? Are you saying that a method of treatment claim must be supported by an actual example? What I'm saying is there has to be a teaching of how to carry out the invention, particularly with regard to its novel aspects. And here, among other things, the novel aspect was figuring out the dosing of an irreversible EGFR inhibitor to treat gefitinib or latinib-resistant dosing. They distinguished what was taught in the prior art for dosing irreversible EGFR inhibitors. Moreover, as they pointed out in distinguishing that art, the specific number matters. And for example, in that case that they were doing, which is an inhibitor, by the way, our inhibitor that was developed after 2005 and that has special functional attributes, was only 80 and that 500 was six, more than six times higher, too high. So they are criticizing the prior art for teaching, poses the wrong dosing for administering irreversible inhibitors on a daily basis, criticizing overdosing. There is an upper limit and that upper limit is dose-limiting toxicity. None of this is taught in the patent. And also, the patent, as a result, does not teach how to identify among the universe of irreversible EGFR inhibitors that will covalently bind to the cysteine which ones will have a unit dose, which ones you can carry the invention out. And the examiner pointed that out as well. So this is nothing but giving a research assignment to the world to figure out. And the final solution, which is Tigriso, the drug here, was not what is taught in the patent. The patent teaches binding wild-type. And the patent here is one that minimizes binding to wild-type and targets the mutant. That's not taught in the patent. It wasn't known in 2005. And in fact, the owner of Venture admitted in 2010 that it was of major clinical significance to develop this type of inhibitor because it overcame the dose-limiting toxicity and why you can't get to the doses that you need to. That is at appendix 151132-33, 17720-17805. So we have a case here. This is, if you remember the old Herschler case about administration of steroids, the court there acknowledged that if that case had involved novel steroids and not well-known steroids whose administration was well-known, it would be a different case. That is this case. Irreversible EGFR inhibitors were not well-known. The patent extends into classes of irreversible EGFR inhibitors that were novel. Dosing of irreversible EGFR inhibitors were not known. And the patent doesn't teach any of it. The claim in this case does not include any safety, efficacy, or requirement. There was, in the district court's opinion, there is a great deal of discussion about toxicity and the fact that not all of these compounds will work because some of them will produce a toxic result. But the claim doesn't call for or address toxicity. That strikes me as being misplaced. That's an FDA requirement, not a patent requirement. So why am I wrong in quoting that? What the court actually said is that it was going to go with the specification definition of unidose, a predetermined quantity of active materials calculated to produce the desired therapeutic effect, and that that would be on a daily basis. It did not say what more that means. What does it mean to achieve, to produce the desired therapeutic effect? Wyeth urged it not to, saying at 1130, arguing, in fact, that the specification does not further define the therapeutic effect. And we warned that there would be argument of ambiguity. But what was disputed in the case the whole time was, could you find an amount that could be administered daily to a patient that would be calculated to produce the therapeutic effect? Because of the problem. I understand that, and I think that District Court's opinion is clear to some extent in that regard. But there is a great deal of discussion about toxicity, even in some reference to fatality, which strikes me as being misplaced. Why am I wrong? Because I think what the discussion, there was a limiting motion that Wyeth made before trial to keep out all of this evidence about the inability to administer many of these irreversible EGFR inhibitors, including all the ones identified in the patent, because the concentration needed to actually inhibit the enzyme in the patient was five times or more than the most that could be administered because of dose-limiting toxicity. So the question of, can you administer a unit dose to a patient? That is, can you calculate an amount to produce the desired therapeutic effect, was in terms of, is there a therapeutic window? Is the dose-limiting toxicity sufficiently below the dose you need to get the desired, to get an effect that you cannot administer it? What are we talking about when you say dose-limiting toxicity? Because this is a little bit of my problem is, I mean, I assume we all agree that patient death is not within, you know, the unit dosage can't be effective if it results in patient death. But I mean, these are people dying of cancer. It can have really, really dramatic side effects, right, that people will be willing to put up with for an additional year or two of their life. So what does it mean to be dose-limiting toxicity? So in fact, what is this? So I'll give you two answers to that, because they're consistent. So the standard way of understanding that is, what is the maximum, is the maximum tolerated dose? In fact, that was in the, throughout the trial record, that is consistent, that the maximum tolerated dose is the highest dose that can be used therapeutically in patients. That's at appendix 15145. Inventor Haber, the most you can administer to patients therapeutically is the maximum tolerated dose.  Appendix 17396. That's 3, 3, 4, 20 to 23. Are you saying there's a failure of a needed dose, or that the dosages stated in the patent are defective? I'm saying both. That one of the problems is, many, appears most of irreversible EGFR inhibitors. The concentration you need to inhibit gifitinib or allotinib-resisting cancer, which turns out to be extremely active, which maybe shouldn't be a surprise, but caught people by surprise, means that to inhibit them, you need very high doses. And the inhibitors that were known at the time could not be administered then. And I understand your point about cancer patients, but there are limits to something that is administered on a daily basis. And why argue that to get this patent? Because they said specifically, for example, Appendix 37415, that these resistance-surmounting amounts of irreversible EGFR inhibitors, taught by Agus, could not be administered on a daily basis. What I'm saying then is they've got this range, and the problem with the patent is that the specific inhibitors, or the class of inhibitors they've identified, the dose to actually make it effective and reduce cancer, is a mismatch with the dose a patient can tolerate. And they haven't showed how to match up that gap. That's correct, although I'd go even further, and I would say that could be administered on a daily basis. It's not a simple, oh, I'll tough it out. These are doses that they said themselves in the file history cannot be administered on a daily basis. This is, you know, daily basis is being administered indefinitely every day. There are limits. They argue that there are limits to get the patent. And not only are there many, including the ones in the patent, that there is no therapeutic window. There is no daily unit dose to be calculated. The patent gives no guidance on figuring out how to design one that could be administered. That was work that came later. That was the breakthrough of the irreversible EGFR inhibitors that are wild-type sparing mutant selective that target only the resistant cancer. And they're not perfect. They have some off-target effects, but that was designed, not taught anywhere. The vast majority of irreversible inhibitors do not have a therapeutic window so that it could be administered on a daily basis. And even the range, the narrowest range of the patent is up to 500. In fact, it suggests up to 1,000. But even in the file history, they criticize the prior art for teaching 500 because of problems with the ability to administer on a daily basis. So they recognize that. That is a point they made a point of novelty. They can say now, oh, we just meant conventional doses. That had no meaning for an irreversible EGFR inhibitor in 2005. And they don't disclose any particular, quote, conventional dose for an irreversible EGFR inhibitor. And it was undisputed. And the district court below found it, that there is no working examples in the patent. It did not challenge that conclusion by the district court. Thank you. Thank you, counsel. Thank you, Your Honor. Ms. Sweezy has some rebuttal time. Thank you, Your Honor. I'm going to start with a very important threshold question. Maximum tolerated dose. Dose-limiting toxicity and therapeutic window are not relevant. Those are FDA terms that we heard from AstraZeneca's own Dr. Taft at appendix 17490, 17563, and 17483. Those are FDA standards. The district court ruled those are out multiple times. AstraZeneca, at 28 of its red brief, agrees those are out. Those are legally irrelevant concepts. And all of AstraZeneca's evidence, and you can go through it chapter by verse, they are consistently talking about clinical standards. The Gotenheim and reference that it points to talks about clinical standards. This is all FDA balancing side effects. What our patents claim, and the district court said this at appendix 58, is killing cancer cells. That's shown in the patent, and it enables. We don't have to actually reduce to practice. We enable an artisan who's already in this field, already familiar with other cancers, dosing at conventional ranges. There is nothing in the record. When you take away AstraZeneca's reliance on FDA standards, there is nothing in the record about concerns of dosing between 200 to 500, or 1 in 1,000. It is a complete failure of proof. Their case falls because they have no evidence under the claim construction that they themselves admit is a limiting construction and does not concern toxicity and safety. That is exactly like United Therapeutics that this court held. When a district court, and the construction is not challenged on appeal, is talking about a specific type of effectiveness, killing cancer cells. That's all we have to enable. We don't have to reduce it to practice. And I would commend the court to read the district court's opinion at 56 to 57, and AstraZeneca's brief at 28. And just in terms of unit dosage, Dr. Taft, again, admitted that other cancer therapies is relevant when we're talking about killing cancer cells. And a prior art reference was 2 to 1,000. That was conventional. The jury heard this. These are fact questions. The jury heard this and resolved it in our favor, and the judgment should be reversed. Thank you, Your Honor. Thank you to both counsel. The case is submitted.